*In The*

# United States Court of Appeals

*for the*

# Third Circuit

Case No. 13-2446

JOHN THORPE;
SAC AND FOX NATION OF OKLAHOMA;
WILLIAM THORPE; RICHARD THORPE

v.

BOROUGH OF JIM THORPE; MICHAEL SOFRANKO;
RONALD CONFER; JOHN MCGUIRE; JOSEPH MARZEN;
W. TODD MASON; JEREMY MELBER; JUSTIN YAICH;
JOSEPH KREBS; GREG STRUBINGER; KYLE SHECKLER;
JOANNE KLITSCH

Borough of Jim Thorpe,

*Appellant-Cross Appellee*

*(continuation of caption on next page)*

*Appeal from an Order entered from the
United States District Court for the Middle District of Pennsylvania*

## AMICUS BRIEF ON BEHALF OF
## APPELLANT-CROSS APPELLEE AT 13-2446

DANIEL H. WHEELER
610 MONTGOMERY SCHOOL LANE
WYNNEWOOD, PA 19096
(610) 664-2431

*Attorneys for Michael Koehler and
John Thorpe*

Case No. 13-2451

JOHN THORPE;
SAC AND FOX NATION OF OKLAHOMA;
WILLIAM THORPE; RICHARD THORPE

v.

BOROUGH OF JIM THORPE; MICHAEL SOFRANKO;
RONALD CONFER; JOHN MCGUIRE; JOSEPH MARZEN;
W. TODD MASON; JEREMY MELBER; JUSTIN YAICH;
JOSEPH KREBS; GREG STRUBINGER; KYLE SHECKLER;
JOANNE KLITSCH

Sac and Fox Nation of Oklahoma, William Thorpe,
Richard Thorpe,

*Appellants-Cross Appellee.*

_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

I.   STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY ..............1

II.  SUMMARY OF FACTS ................................................................3

III. ARGUMENT....................................................................................4

    A.   NAGPRA AND ITS PURPOSES ........................................5

    B.   NAGPRA IS INAPPLICABLE ON ITS FACE ...................8

        1.   The Original Gravesite Of Jim Thorpe Is Not A Collection ................................................................8

        2.   Remains Cannot Be "Repatriated" From Original Gravesites................................................................11

    C.   NAGPRA WAS NOT INTENTED BY CONGRESS TO APPLY TO MODERN FUNERALS.................................13

    D.   NAGPRA'S SAVINGS CLAUSE ALSO DICTATES REVERSAL ........................................................................18

    E.   CONGRESS MAY HAVE MADE A MISTAKE.............................20

IV.  CONCLUSION...........................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Geronimo v. Obama*,
　725 F. Supp. 2d 182 (D. D.C. 2010)..........................................................10, 11

*Hawk v. Danforth*,
　No. 06–C–223, 2006 WL 6928114 (E.D. Wisc. Aug. 17. 2006) ........8, 10, 11

*Hohn v. United States*,
　524 U.S. 236 (1998)....................................................................................9

*Kickapoo Traditional Tribe of Texas v. Chacon*,
　46 F. Supp. 2d 644 (W.D. Tex. 1999) ........................................ 15-16, 17, 19

*Pettigrew v. Pettigrew*,
　56 A. 878 (Pa. 1904)................................................................................19

*Ray v. Pennsylvania State Police*,
　654 A.2d 140 (Pa. Commw. 1995)..............................................................19

*Sunrise Quoyavema v. Hopi Tribal Court*,
　4 Am. Trib. L. 415 (Hopi App. 2002) ....................................................16, 19

*Yankton Sioux Tribe v. United States Army Corps of Engineers*,
　83 F. Supp. 2d 1047 (D. S.D. 2000) ...........................................................6

**Statutes & Other Authorities:**

Fifth Amendment to the U.S. Constitution ...........................................................21

18 U.S.C. § 1170.................................................................................................8

20 U.S.C. § 80q-9...............................................................................................12

25 U.S.C. § 3001(8) .......................................................................................8, 17

25 U.S.C. § 3001(13) .........................................................................................20

25 U.S.C. § 3003...........................................................................................6, 9, 10

25 U.S.C. § 3003(a) .........................................................................................6, 9

25 U.S.C. § 3005 .......................................................................................*passim*

28 U.S.C. § 3005(a) ...........................................................................12

25 U.S.C. § 3005(a)(1) .........................................................................7

28 U.S.C. § 3005(c) ............................................................................20

25 U.S.C. § 3009(4) .........................................................................7, 18

25 U.S.C. § 3009(5) ............................................................................19

25 U.S.C. §§ 3001-3013 .................................................................*passim*

26 U.S.C. § 3002.........................................................................8, 10, 16

43 C.F.R. § 10.10(c)(3) .......................................................................21

136 Cong. Rec. E3484-01 (Oct. 27, 1990) .........................................15

136 Cong. Rec. H10985 (Oct. 22, 1990) ............................................15

H.R. Rep. 101-877 (1990)........................................................13, 15, 20

Pub. L. No. 101-601, 104 Stat. 3048 (1990) .........................................6

S.R. 101-473 (1990)............................................................................20

20 Pa. C.S.A. § 305(b) ........................................................................18

Cal. Health & Safety § 8016 (2013) ...............................................12-13

Ga. Code § 44-12-261 (2013) .............................................................13

Me. Rev. Stat. § 22-2842-B (2012) .....................................................13

Mont. Code § 22-3-912 (2013) ...........................................................13

Utah Code § 9-9-403 (2012) ...............................................................13

Fed. R. App. P. 29(b) ............................................................................2

Fed. R. App. P. 29(c)(5).........................................................................2

Fed. R. App. P. 29(c)(5)(C) ...................................................................2

Al Zagofsky, *Twenty-Three Years Ago, A Jack Thorpe Letter Praised Memorial Site*, The Times News (May 24, 2013) ..........................................4

C. Timothy McKeown and Sherry Hutt, *In The Smaller Scope of Conscience:  The Native American Graves Protection & Repatriation Act Twelve Years After*, 21 UCLA J. Env. L. & Pol. 153 (2002-03) ...................................................21

Cecily Harms, *Note, NAGPRA In Colorado:  A Success Story*,
        83 U. Colo. L. Rev. 593 (2012)...............................................................14, 17

Christopher A. Amato, *Digging Sacred Ground:  Burial Site Disturbances
        and the Loss of New York's Native American Heritage*,
        27 Colum. J. Env. L. 1 (2002) .......................................................................13

Jack F. Trope and Walter R. Echo-Hawk, *The Native American Graves
        Protection and Repatriation Act: Background and Legislative
        History*, 24 Ariz. L.J. 35 (1992) .....................................................................6

Stephen J. Gunn, *The Native American Graves Protection and
        Repatriation Act at Twenty:  Reaching the Limits of Our National
        Consensus*, 36:2 William Mitchell L. Rev. 503 (2010)...........................12, 14

# I. <u>STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY</u>

Michael Koehler and John Thorpe are the grandsons of Jim Thorpe, and thus the nephews of the two individual plaintiffs in this lawsuit.[1]  Like their grandfather, they are of Native American ancestry.  They submit this brief in support of the Borough of Jim Thorpe ("the Borough"), where their grandfather was buried by his family in 1957.  The district court held that the Borough should be considered  a "museum" under the Native American Graves Protection and Repatriation Act, 25 U.S. C. §§ 3001 to 3013 (2013) ("NAGPRA"), and that the remains of Jim Thorpe are subject to NAGPRA's "repatriation" provisions, *i.e.*, that he can be disinterred and moved to wherever the plaintiffs choose.  The Borough has appealed that decision, and the Thorpe grandsons support its reversal.

The Thorpe grandsons believe their grandfather should rest in peace and that their family's burial decision should be respected.  They are also concerned that if

---

[1] The descendants of Jim Thorpe can be divided into two branches: those stemming from the children of his first marriage (to the former Iva Miller), and those stemming from the children of his second (to the former Freeda Kirkpatrick).  *Amici* Michael Koehler (age 75) and John Thorpe (age 56) are part of the first branch.  Michael Koehler is the first-born grandson of Jim Thorpe and is the oldest surviving member of this first branch of the family.  John Thorpe is Michael Koehler's brother and is also a grandson of Jim Thorpe.  Michael Koehler and John Thorpe are the sons of Charlotte Thorpe, one of Jim Thorpe's four children from his first marriage, all of whom are deceased.  The other three children of Jim and Iva Thorpe were James Jr. (who died as an infant), Gail, and Grace.  The individual plaintiffs in the case below are from the family's second branch.  Richard and William Thorpe are two of Jim Thorpe's four children from his second marriage. The other two children, Carl and John (known as "Jack") are deceased.  Jack Thorpe was the original plaintiff in this lawsuit.

the ruling below stands, their own family burial decisions, and those of every other Native American family, will forever be jeopardized.  Stated without exaggeration, the court below held that NAGPRA can require repatriation of the remains of *every* person of *any* Native American ancestry, whether buried fifty-six years ago, tomorrow, or any time in the future.  That was a breathtaking decision, and would lead to results Congress could never have intended.

Additionally, the Thorpe grandsons believe it is important for the Court to understand that there is not unanimity – neither in the family nor in the Native American community – about where Jim Thorpe should rest.  This can be an emotional issue to many, and no one has a greater right to be emotional than the Thorpe grandsons.  Still, they wish this case to be resolved not with emotion, but under the law.  They believe that the district court applied the wrong law.

The authority to file this brief is based on the attached motion, pursuant to Fed.R.App.P. 29(b).  Plaintiffs, including the individual plaintiffs (who are the uncles of Mr. Koehler and Mr. Thorpe) refused to consent to its filing.

In accordance with Fed.R.App.P. 29(c)(5), *amici* state that:  (A) no party's counsel authored this brief in whole or in part; (B) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, (C) no person other than those set forth in Fed.R.App.P. 29(c)(5)(C) contributed money that was intended to fund preparing or submitting the brief.

## II. **SUMMARY OF FACTS**

James Francis Thorpe – Jim Thorpe – was one of this country's greatest athletes, and is a true American folk hero of partial Native American ancestry. He was also a real person, one with a family and a widow. And upon his death, he was buried by that widow in the Borough, in 1957. No one disputes the legality of that burial, or the right of his widow to select the burial location. Nor does anyone dispute that the Borough has been an honorable caretaker of Jim Thorpe's remains and legacy.

While the relevant facts of this case are entirely undisputed, perhaps more important are those "facts" that are untrue and not found in the record. First, Jim Thorpe's widow did not "shop" his remains around and deliver them to the highest bidder. There is no evidence that Patricia Thorpe asked for or received anything from the Borough other than honorable treatment of her husband during a time in America when such treatment of Native Americans and their remains was not assured – the days before NAGPRA.

Second, Jim Thorpe's gravesite is not a tacky tourist attraction. It is a solemn place on a remote hillside, and a place where several Native American rituals were performed on his behalf. It is also a memorial befitting a legend, one that all Americans treasure. The *original plaintiff in this case*, Jack Thorpe, once said this about a visit to the gravesite:

> Holding to traditional Indian ways, I took Indian medicine with me for an early morning visit to my father's grave site. I prayed to the four directions and over my father's remains, I sat down on the steps of the monument and asked for inner peace and guidance.  In the quiet morning hours, I felt the peacefulness of the area.  I felt that there was no conflict with my father's being on the hill side.  I have felt the respect and love the people of Jim Thorpe have for my father and the surrounding country that makes up the town of Jim Thorpe. * * * I now feel that the remains of Jim Thorpe are in a good place and that he is at peace. I think that if dad were living today he would smile, shake someone's hand, pat another on the back and say "This is a good place to be."

Al Zagofsky, *Twenty-Three Years Ago, A Jack Thorpe Letter Praised Memorial Site*, The Times News (May 24, 2013).

## III. <u>ARGUMENT</u>

The district court erred when it ruled that NAGPRA governs the remains of Jim Thorpe.  The statute is inapplicable on its face, as NAGPRA applies only to human remains held in museum "collections," not those found in original burial sites.  Nothing in NAGPRA provides authority to disinter remains from a burial site to create such a collection.  Nor can Jim Thorpe's remains be "repatriated" under NAGPRA because they were never wrongfully removed from anywhere, as the statue requires.  NAGPRA was also never intended to supersede rights under state law.

Both the legislative history and all scholarly analysis of NAGPRA support this interpretation.  NAGPRA was enacted by Congress to redress centuries of shameful accumulation of Native American remains by museums – remains robbed

4

from graves or looted from battlefields.  There is not a hint in either the legislative history or the extensive analysis following its passage that NAGPRA could be applied to modern funerals.  Nor is there a single reported case under NAGPRA or similar repatriation statues where anyone even attempted to apply the law in this way (other than the decision below).  In fact, every other reported case supports the opposite result.

Perhaps worst of all is realization of the full scope of the district court's ruling.  Imagine a scenario where a deceased person is buried by his widow at the site of her choosing.  But after the widow dies, the next generation – or even complete strangers in the case of a tribe – decides to dig up the body with court approval and move it somewhere else for any reason they desire.  They aren't even required to rebury the remains.

That is not a "parade of horribles" conjured up by the Thorpe grandsons.  That is their reality.  If the district court's decision is allowed to stand, this scenario can repeat for funerals past and future as long as the deceased has any Native American ancestry.  Each time it will be an injustice, and far beyond anything Congress could have conceived when it passed NAGPRA.  To the contrary, this was precisely the scenario NAGPRA was enacted to prevent.

A.  **NAGPRA AND ITS PURPOSES**

It is sadly ironic that the plaintiffs brought this action under NAGPRA, the

stated purpose of which is: "[t]o provide for the protection of Native American graves. . . ." Pub.L.No. 101-601, 104 Stat. 3048 (1990). Enacted in 1990, NAGPRA "culminates decades of struggle by Native American tribal governments and people to protect against grave desecration, to repatriate thousands of dead relatives or ancestors, and to retrieve stolen or improperly acquired religious and cultural property back to Native owners." Jack F. Trope and Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History,* 24 Ariz.L.J. 35, 36 (1992); s*ee also Yankton Sioux Tribe v. United States Army Corps of Engineers,* 83 F.Supp.2d 1047, 1055 (D. S.D. 2000) (citing Trope and Echo-Hawk).

Although the plaintiffs ultimately seek relief under only two provisions of NAGPRA – Sections 3003 and 3005 – the district court's decision largely ignored Section 3003. That was an error. Before repatriation under Section 3005 can be considered, the inventory provisions of Section 3003 must be satisfied.

> Each Federal agency and each museum which has possession or control **over holdings or collections** of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item.

25 U.S.C. § 3003(a) (emphasis added). In ruling as it did, the court below wrote the highlighted terms out of the statue, and thus frustrated Congressional intent.

Only after items in museum collections have been inventoried may the repatriation provisions of Section 3005 become applicable. That section requires repatriation of inventoried human remains to their identified lineal descendants, or to the tribe with which the remains are affiliated. It provides, in relevant part:

> If, pursuant to section 3003 of this title, the cultural affiliation of Native American human remains . . . with a particular Indian tribe . . . is established, then the . . . museum, upon the request of a known lineal descendant of the Native American or of the tribe or organization . . . shall expeditiously return such remains . . . .

25 U.S.C. § 3005(a)(1).

NAGPRA does not impose any obligations on lineal descendants or tribes after remains have been repatriated. Thus, nothing in NAGPRA requires repatriated remains to be reburied. Although Section 3005 is titled "Repatriation," that term is defined nowhere in the statute.

NAGPRA contains a "savings provision" that further reinforces its inapplicability to this matter. "Nothing in this chapter shall be construed to . . . limit any procedural or substantive right which may otherwise be secured to individuals . . . ." 25 U.S.C. § 3009(4). Here, the rights of the Thorpe family would be violated if his widow's burial decision is overturned by the application of NAGPRA.[2]

---

[2] NAGPRA also prohibits illegal trafficking in Native American artifacts and remains, and governs the care of such items discovered on federal or tribal lands

## B.  NAGPRA IS INAPPLICABLE ON ITS FACE

### 1.  The Original Gravesite Of Jim Thorpe Is Not A Collection

Under a plain reading of NAGPRA, it does not apply to the gravesite of Jim Thorpe.  NAGPRA applies only to human remains found in museum collections, not those resting in original gravesites.  Nor does NAGPRA require the disinterment of such remains to artificially create a collection for inventory and repatriation.  As one district court reasoned, this would be a "backwards" interpretation of the statute.  *See Hawk v. Danforth*, No. 06–C–223, 2006 WL 6928114 at *2 (E.D.Wisc. Aug. 17. 2006).

A close reading of NAGPRA demonstrates that Congress was careful to limit its scope.  Not every institution that could be considered a "museum" under the broad jurisdictional definition of that term need comply with the inventory and repatriation provisions.  Only those that were true museums, with "collections" of Native American artifacts.  A single body, in an original gravesite of his family's choosing, is not a collection under any reasonable interpretation of that term.

The statute defines a museum as any state or local government agency "that receives Federal funds and has possession of, or control over, Native American cultural items."  25 U.S.C. § 3001(8).  Congress repeated this "possession or

---

after its enactment.  *See* 18 U.S.C. § 1170 (2011); 26 U.S.C. § 3002.  These provisions do not apply here.

control" language in the inventory provisions of Section 3003, but also added a

limitation.  A museum, as defined by NAGPRA, must only comply with Section

3003 if it maintains collections or holdings of Native American artifacts.  "Each

Federal agency and each museum which has possession or control **over holdings**

**or collections** of Native American human remains and associated funerary objects

shall compile an inventory of such items . . . ."  25 U.S.C. § 3003(a) (emphasis

added).

Congress certainly intended something by this limitation, but the district

court chose to ignore it completely and essentially wrote the highlighted terms out

of the statute.  If NAGPRA is to be interpreted as the district court and the

plaintiffs wish, then there was no reason for Congress to include those words.  The

statue would be grammatically correct without them.  But Congress did include

them, and they therefore must be given meaning.  *See Hohn v. United States*, 524

U.S. 236, 250 (1998) ("[W]here Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposely in the disparate inclusion

or exclusion.") (internal quotation marks and citations omitted).

There is no need to resort to principles of statutory interpretation to

determine precisely in what other factual circumstances Section 3003 might apply

(though, as discussed below, those principles reinforce is inapplicability here).  For

this case, the statute's plain meaning is clear. Jim Thorpe's remains are simply not part of a collection or holdings by the Borough. The Borough is thus not required to "inventory" his body under Section 3003, and the body is therefore not subject to "repatriation" under Section 3005.

The only other court to have considered this issue found that human remains in burial sites cannot be considered as part of museum holdings and collections under NAGPRA. In *Geronimo v. Obama*, 725 F.Supp.2d 182 (D. D.C. 2010), the lineal descendants of the legendary Apache leader Geronimo brought suit against Yale University and others seeking repatriation of his remains (wherever buried) under NAGPRA. The district court dismissed the complaint in its entirety, finding that NAGPRA does not require excavation of gravesites to compile inventories under Section 3003. *Id.* at FN4. "The plaintiffs refer to 25 U.S.C. § 3003, which required federal agencies and museums to create inventories of 'holdings or collections of Native American human remains and associated funerary objects.' However, the **plaintiffs do not point to any authority interpreting this or any other section of NAGPRA as requiring an intentional excavation**." *Id.* (emphasis added).

Another district court considering Section 3002 of NAGPRA likewise held that it did not apply to remains that are "still buried." *Hawk v. Danforth*, No. 06–C–223, 2006 WL 6928114 at *2 (E.D.Wisc. Aug. 17. 2006). In *Hawk*, as in

*Geronimo*, the plaintiff claimed the right under NAGPRA to an intentional excavation to find burial sites, which to the district court seemed contrary to NAGPRA's purposes. "**This has [NAGPRA] backwards**," the court reasoned. *Id*. (emphasis added). "Simply put, no provision in [NAGPRA] requires a Tribe or anyone else to excavate an area in order to find remains or other artifacts." *Id*.

Plaintiffs, as well as the district court, also have NAGPRA backwards. Plaintiffs seek to use a statue passed to protect Native American graves for precisely the opposite purpose: to disturb a Native American grave. Under NAGPRA, this is simply impossible. Repatriation of remains is not considered unless those remains are found in a museum collection. Bodies in the gravesites are not a collection, and nothing in NAGPRA requires a museum or anyone else to create such a collection by digging up gravesites: not potential ones as in *Geronimo* and *Hawk*, and certainly not actual ones in the case of Jim Thorpe.

### 2.  Remains Cannot Be "Repatriated" From Original Gravesites

Even if the Court were to first consider the repatriation provisions of Section 3005, it would likewise find them inapplicable. NAGPRA expressly only governs remains that can be "repatriated" or "returned." For something to be repatriated or returned, it must have been wrongfully taken from somewhere. Here, Jim Thorpe was lawfully buried by his widow under state law at the location of her choosing, not robbed from a grave or battlefield. Repatriation or return is simply impossible.

11

Section 3005 is titled "Repatriation," and requires museums to "return" remains in their collections. 28 U.S.C. § 3005(a). In this case, to where can the remains be "returned?" Jim Thorpe's remains were not unlawfully excavated from an earlier burial site or wrongfully taken from anywhere else. They are resting in his original and only burial site in the Borough. If they are removed from the Borough, the Thorpe grandsons or other lineal descendants might have a claim for repatriation if NAGPRA applied. But until that happens, repatriation is simply impossible under NAGPRA's plain meaning.

Indeed, other than the district court's decision below, *amici* are not aware of a single reported case where anyone even argued that a modern body known to be resting in its original gravesite can be "repatriated," not under NAGPRA or any of the other federal or state repatriation statutes.

The National Museum of the America Indian Act, which applies only to the Smithsonian, contains a repatriation provision that was the model for NAGPRA. 20 U.S.C. § 80q-9 (2013). That section has never been applied to repatriate a body resting in an original gravesite. Prior to NAGPRA, four states passed their own repatriation laws, and several more have followed since. *See* Stephen J. Gunn, *The Native American Graves Protection and Repatriation Act at Twenty: Reaching the Limits of Our National Consensus*, 36:2 William Mitchell L.Rev. 503, 511 (2010) (listing Arizona, Hawaii, Kansas, and Nebraska); *see also* Cal. Health & Safety

§ 8016 (2013); Ga. Code § 44-12-261 (2013); Me. Rev. Stat. § 22-2842-B (2012);

Mont. Code 22-3-912 (2013); Utah Code § 9-9-403 (2012).  The Thorpe grandsons

are aware of no instance where any of those statutes were used to repatriate a body

from an original gravesite.

All of this points to only one conclusion:  NAGPRA, on its face, does not

apply to the remains of Jim Thorpe.  As shown below, Congress did not intend it to

apply either.

## C.   NAGPRA WAS NOT INTENTED BY CONGRESS TO APPLY TO MODERN FUNERALS

NAGPRA's inapplicability under its plain meaning is only buttressed by

Congress's plain intent.  Examination of the extensive legislative history of

NAGPRA confirms that it was never meant to apply to modern funerals and

original gravesites.  Rather, it was enacted for two primary purposes:  (1) to protect

Native American gravesites; and, (2) to liberate wrongfully acquired Native

American remains and artifacts from museum collections.  *See* H.R. Rep. 101-877

at 10 (1990); Christopher A. Amato, *Digging Sacred Ground:  Burial Site*

*Disturbances and the Loss of New York's Native American Heritage*, 27

Colum.J.Env.L. 1, 17 (2002).  The use attempted by plaintiffs and sanctioned by

the district court satisfies neither of these purposes.  It would contravene the first

and is unrelated to the second.

In enacting NAGPRA, Congress was concerned not with Native American bodies buried by modern families, but those looted from burial sites or "collected" from battlefields before they could be buried.  "Many, if not most, of these items were stolen or seized from Indians during the last two centuries. They were looted from Indian villages, ceremonial grounds, massacre sites, battlefields, schools, and prisons; excavated from burial grounds and unmarked Indian graves; and otherwise misappropriated from Indians and their tribes."  Gunn at 504.  NAGPRA was enacted "to correct the human rights violations caused by centuries of looting Native American graves, stealing from tribes, and displaying stolen human remains and objects in museums."  Cecily Harms, *Note, NAGPRA In Colorado:  A Success Story*, 83 U.Colo.L.Rev. 593, 594 (2012).

Those were the human remains that Congress wanted repatriated under NAGPRA.  During one of the many hearings and proceedings surrounding NAGPRA's passage, Representative Campbell was one of several elected officials to make clear this intent:

> Today thousands upon thousands of Native American human remains and sacred objects are housed in museums and Federal agencies across the country.  They are kept in boxes, crates, and small wooden file drawers, tagged and numbered.  Many of these remains and sacred objects came from the all-too-common practice of digging Indian graves and using the contents for profit or to satisfy some morbid curiosity.

136 Cong. Rec. H10985, 10988 (Oct. 22, 1990). NAGPRA sponsor Representative Udall voiced the same expression of Congressional intent. "For decades, the skeletal remains of American Indians were removed from their burial sites, studied, cataloged, and relegated to the bins of museums and science. This legislation is about respecting the rights of the dead, the right to an undisturbed resting place." 136 Cong. Rec. E3484-01 (Oct. 27, 1990). The House Report accompanying NAGPRA makes the same point. "Digging and removing the contents of Native American graves for reasons of profit or curiosity has been common practice. These activities were at their peak during the last century and the early part of this century." H.R. Rep. 101-877 at 11.

Space considerations do not permit a complete accounting of this legislative history and scholarly analysis. Suffice it to say that all sources are unanimous in declaring that the purpose of NAGPRA was to rectify centuries of shameful treatment of Native American remains and cultural items, not to trump family decisions on where loved ones should be buried. Nowhere in this vast history and analysis is there even a hint that NAGPRA could or should be applied to a modern funeral.

Another court confronted this issue in similar circumstances, and ruled that NAGPRA did not apply to modern burials, based in part upon this legislative history. In *Kickapoo Traditional Tribe of Texas v. Chacon*, 46 F.Supp.2d 644

(W.D. Tex. 1999), a tribe sought to prevent the state of Texas from disinterring one of its recently-deceased members for the purpose of conducting an autopsy. The tribe argued that disinterment was forbidden under Section 3002 of NAGPRA, which governs excavation of human remains on federal and tribal lands. The district court found NAGPRA inapplicable to such a modern burial. Examining the overall purpose of the statute, and basing its ruling on the definition of "human remains," the court found that the term "was intended to mean ancient human remains or those with some sort of cultural or archaeological interest." *Id*. at 650. *Cf. Sunrise Quoyavema v. Hopi Tribal Court*, 4 Am.Trib.L. 415 (Hopi App. 2002) (also holding that NAGPRA did not apply to modern burials).

The court also refused to blindly apply NAGPRA to those facts because of the plainly unintended and dangerous consequences that could result. "[T]he Tribe's interpretation of NAGPRA would permit any person to evade an inquest by obtaining possession of a corpse by nefarious means and burying it on tribal lands. Congress apparently never considered this when drafting the statute." *Id*. at 651.

What the *Kickapoo* decision best demonstrates is what can happen when NAGPRA is applied to modern burials, and why it should not be. NAGPRA was enacted to redress past injustices, not to intrude on modern realities and thereby create new injustices.

The consequences of the district court's decision in this matter would be far greater and far more dangerous than those avoided in *Kickapoo*.  If the district court is correct, millions of people with Native American heritage could be affected.  The court below held that NAGPRA can apply to every Native American burial – past and future.  The only apparent limitation on that vast scope is the receipt of federal funds – directly or indirectly – by the burial site.  *See* 25 U.S.C. § 3001(8).  Under the decision below, this would be a hurdle easily overcome.

If Congress had intended such comprehensive application, it might have at least added a single word on the subject to either the statute or its legislative history.  One could also ask what proper legislative purpose would be served by such application.  The answer is none.  Application on this scale may also raise constitutional concerns, as argued in the Borough's brief.  Fortunately, this Court need not reach that issue, as Congress plainly never intended the statute to have such broad reach.

Finally, it should also be noted that NAGPRA places no obligations on either lineal descendants or tribes concerning what they do with human remains after repatriation.  *See* Harms at 606 ("NAGPRA has no language mandating the reburial of remains, let alone reburial at the original gravesite, despite the importance this original site holds for Native cultures.").  Thus, under the district court's decision, the remains of Jim Thorpe or any other Native American could be

removed from their original burial site and not be reburied. Certainly Congress could not have intended that human remains could be made worse off by application of NAGPRA, but such a result is possible under the district court's ruling.[3]

Like the words of the statute, the intent of Congress was also clear. NAGPRA was not enacted to intrude on the burial decisions of modern families. The district court thus erred when it applied the statute to the remains of Jim Thorpe, and its decision should be reversed.

## D.  **NAGPRA'S SAVINGS CLAUSE ALSO DICTATES REVERSAL**

The savings provision found in NAGPRA further demonstrates that the statute was never intended to apply to modern funerals. "Nothing in this chapter shall be construed to . . . limit any procedural or substantive right which may otherwise be secured to individuals . . . ." 25 U.S.C. § 3009(4). The Borough's brief ably details the many rights of the Thorpe family and estate that would be violated by application of NAGPRA, and the Thorpe grandsons concur in that analysis. For example, Pennsylvania law provides the surviving spouse with near absolute authority to make burial decisions for the deceased. 20 Pa.C.S.A. § 305(b) (2012). Pennsylvania also recognizes a surviving spouse's "quasi-

---

[3] *Amici* do not mean to suggest that plaintiffs have such motivations concerning these remains, only that such a result would be permitted under their interpretation of NAGPRA.

property right" to a deceased spouse's remains.  *See Pettigrew v. Pettigrew*, 56 A. 878, 879 (Pa. 1904); *Ray v. Pennsylvania State Police*, 654 A.2d 140, 142 (Pa. Commw. 1995) (Silvestri, S.J., dissenting).  And while there are extraordinary circumstances under Pennsylvania law where a body may be disinterred against the wishes of a surviving spouse, none of those are even argued to be applicable here.

In *Kickapoo*, the district court found that NAGPRA's savings provision similarly prevented the statute's application to a modern burial.  As described above, *Kickapoo* involved an attempt to use NAGPRA as a shield against disinterment of a recently buried body for purposes of an autopsy.  The court found that this ran afoul with another section of NAGPRA's savings provision, one that stated NAGPRA shall not "limit the application of any State or Federal law pertaining to theft or stolen property."  25 U.S.C. § 3009(5).  Shielding the body from autopsy would impact rights under Texas laws regarding body tampering.  *Id.* at 651.  The savings provision, the court held, "demonstrated Congress's intent that NAGPRA's protections not supersede the legitimate efforts of state and federal law authorities to enforce applicable criminal laws. That conclusion also makes good sense as a matter of public policy."  *Id.*  The Court in *Sunrise Quoyavema* likewise held that the plaintiff's NAGPRA claim was barred under the savings clause because applying NAGPRA to a modern burial in that instance would divest a tribe of substantive and procedural rights.  4 Am.Trib.L. at 419.

Identical considerations compel the same result here.  NAGPRA's reach is not absolute, as the district court held.  The statute's carefully drafted savings provision demonstrates Congressional intent that NAGPRA was never meant to override substantive rights under state law.  This provides still another basis for reversal of the district court's decision.

### E.  <u>CONGRESS MAY HAVE MADE A MISTAKE</u>

*If* the Borough is considered a museum, and *if* NAGPRA applies to the remains of Jim Thorpe, the Borough may still be entitled to keep the remains. NAGPRA plainly gives museums a "right of possession" to human remains in circumstances such as these (25 U.S.C. § 3001(13)), but fails to set forth the legal effect of that right.  By contrast, NAGPRA exempts from repatriation other artifacts to which museums have a right of possession.  *See* 28 U.S.C. § 3005(c).

While earlier versions of the bills that became NAGPRA expressly provided this same exemption for human remains, the enacted version omitted it, even though it retained the language giving museums a right of possession.  It is not clear from the legislative history if this was a mistake, or if it was intentional.  For example, both the Senate and House Reports for NAGPRA indicate that human remains can be exempt from repatriation if the museum has a right of possession. *See* S.R. 101-473 at 8 (1990);  H.R. Rep. 101-877 at 11 (1990).

Even the Department of the Interior seems to have confused this issue when drafting NAGPRA's regulations, and exempted human remains from repatriation when doing so would result in a Fifth Amendment "taking" without just compensation.  *See* 43 C.F.R. § 10.10(c)(3) (2012).

Much of the commentary surrounding NAGPRA also assumes that museums are not required to repatriate remains to which they have a right of possession. *See, e.g.,* C. Timothy McKeown and Sherry Hutt, *In The Smaller Scope of Conscience:  The Native American Graves Protection & Repatriation Act Twelve Years After*, 21 UCLA J. Env.L.&Pol. 153, 195 (2002-03)( "A federal agency or museum may retain control of human remains or cultural items that are discovered, excavated, or are part of a collection if the federal agency or museum has right of possession to the items.").

*Amici* could provide further briefing on this issue if this Court found it necessary or desirable.

## IV.  **CONCLUSION**

Under the plain meaning of NAGPRA, under Congress's intent, and under common sense, NAGPRA does not apply to the remains of Jim Thorpe or to any other modern funeral.  After fifty-six years, the Court should end this matter once and for all and let the man rest.  Congress has required no other result.

The Thorpe grandsons respectfully request that the decision below be reversed, and that the relief sought by the Borough be granted

Respectfully submitted,


Dated:  September 30, 2013          /s/ Daniel H. Wheeler
                                    Daniel H. Wheeler
                                    (Attorney ID #66884)
                                    610 Montgomery School Lane
                                    Wynnewood, PA  19096
                                    610-664-2431

                                    Counsel for Michael Koehler and
                                    John Thorpe

## <u>CERTIFICATE OF ADMISSION TO BAR</u>

Daniel H. Wheeler certifies that he is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

## <u>CERTIFICATE OF COMPLIANCE WITH</u><br><u>FED.R.APP.P. 32(a)(7) AND L.A.R. 31.1</u>

Daniel H. Wheeler hereby certifies that this brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7) because the brief contains 5,326 words, which is less than half the authorized length of the principal brief of appellant Borough of Jim Thorpe, which this brief supports.

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of  Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the 2007 version of Microsoft Word in 14 point Times New Roman font.  This brief complies with the electronic filing requirements of L.A.R. 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected

/s/ Daniel H. Wheeler<br>
Daniel H. Wheeler

**AFFIDAVIT OF SERVICE**

DOCKET NO. 13-2446

--------------------------------------------------------------------------------X

Borough of Jim Thorpe

       vs.

John Thorpe

--------------------------------------------------------------------------------X

      I, Elissa Matias , swear under the pain and penalty of perjury, that according to law and being over the age of 18, upon my oath depose and say that:

      on September 30, 2013

      I served the **Amicus Brief on Behalf of Appellant-Cross Appellee at 13-2446** within in the above captioned matter upon:

Charles L. Riddle, Esq.
Riddle Patent Law
Suite 200
434 Lackawanna Avenue
Scranton, PA 18503
charles@charleslriddle.com
(570) 344-4439

Christopher G. Fusco, Esq.
cfusco@callahanfusco.com
Callahan & Fusco
72 Eagle Rock Avenue, Suite 320
East Hanover, NJ 07936
(973) 618-9770

Daniel E. Gomez, Esq.
dgomez@cwlaw.com
Stephen R. Ward, Esq.
sward@cwlaw.com
Conner & Winters
One Williams Center
Suite 4000
Tulsa, OK 74172
 (918) 586-8984

via **electronic filing and electronic service**, as well as,  **Express Mail** by depositing  **2** copies of same, enclosed in a post-paid, properly addressed wrapper, in an official depository maintained by United States Postal Service.

Unless otherwise noted, copies have been sent to the court on the same date as above for filing via Express Mail.

**Sworn to before me on September 30, 2013**

/s/ Robyn Cocho                                                    /s/ Elissa Matias

_____            _____
Robyn Cocho                                                          Elissa Matias
Notary Public State of New Jersey
No. 2193491
Commission Expires January 8, 2017

Job # 249638